Justice THOMAS, dissenting.
Today a majority of the Court perpetuates its ill-founded abortion jurisprudence by enjoining a perfectly legitimate state law and doing so without jurisdiction. As is often the case with legal challenges to abortion regulations, this suit was brought by abortionists and abortion clinics. Their sole claim before this Court is that Louisiana's law violates the purported substantive due process right of a woman to abort her unborn child. But they concede that this right does not belong to them, and they seek to vindicate no private rights of their own. Under a proper understanding of Article III, these plaintiffs lack standing to invoke our jurisdiction.
Despite the fact that we granted Louisiana's petition specifically to address whether "abortion providers [can] be presumed to have third-party standing to challenge health and safety regulations on behalf of their patients," Conditional Cross-Pet. in No. 18-1460, p. i, a majority of the Court all but ignores the question. The plurality and THE CHIEF JUSTICE ultimately cast aside this jurisdictional barrier to conclude that Louisiana's law is unconstitutional under our precedents. But those decisions created the right to abortion out of whole cloth, without a shred of support from the Constitution's text. Our abortion precedents are grievously wrong and should be overruled. Because we have neither jurisdiction nor constitutional authority to declare Louisiana's duly enacted law unconstitutional, I respectfully dissent.
I
For most of its history, this Court maintained that private parties could not bring suit to vindicate the constitutional rights of individuals who are not before the Court. Kowalski v. Tesmer , 543 U.S. 125, 135, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (THOMAS, J., concurring) (citing Clark v. Kansas City , 176 U.S. 114, 118, 20 S.Ct. 284, 44 L.Ed. 392 (1900) ). But in the 20th century, the Court began to deviate from this traditional rule against third-party standing. See Truax v. Raich , 239 U.S. 33, 38-39, 36 S.Ct. 7, 60 L.Ed. 131 (1915) ; Pierce v. Society of Sisters , 268 U.S. 510, 535-536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). From these deviations emerged our prudential third-party standing doctrine, which allows litigants to vicariously assert the constitutional rights of others when "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." Kowalski , supra, at 130, 125 S.Ct. 564 (quoting Powers v. Ohio , 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ).[1]
*2143 The plurality feints toward this doctrine, claiming that third-party standing for abortionists is well settled by our precedents. But, ultimately, it dodges the question, claiming that Louisiana's standing challenge was waived below. Both assertions are erroneous. First, there is no controlling precedent that sets forth the blanket rule advocated for by plaintiffs here-i.e. , abortionists may challenge health and safety regulations based solely on their role in the abortion process. Second, I agree with Justice ALITO that Louisiana did not waive its standing challenge below. Post , at 2165 - 2166 (dissenting opinion).
But even if there were a waiver, it would not be relevant. Louisiana argues that the abortionists and abortion clinics lack standing under Article III to assert the putative rights of their potential clients. No waiver, however explicit, could relieve us of our independent obligation to ensure that we have jurisdiction before addressing the merits of a case. See DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). And under a proper understanding of Article III's case-or-controversy requirement, plaintiffs lack standing to invoke our jurisdiction because they assert no private rights of their own, seeking only to vindicate the putative constitutional rights of individuals not before the Court.
A
The Court has previously asserted that the traditional rule against third-party standing is "not constitutionally mandated, but rather stem[s] from a salutary 'rule of self-restraint' " motivated by "prudential" concerns. Craig v. Boren , 429 U.S. 190, 193, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (quoting Barrows v. Jackson , 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) ). The plurality repeats this well-rehearsed claim, accepting its validity without question. See ante , at 2117 - 2118. But support for this assertion is shallow, to say the least, and it is inconsistent with our more recent standing precedents.
As an initial matter, this Court has never provided a coherent explanation for why the rule against third-party standing is properly characterized as prudential. Many cases reciting this claim rely on the Court's decision in Barrows , which stated that the rule against third-party standing is a "rule of self-restraint" "[a]part from the jurisdictional requirement" of Article III, 346 U.S. at 255, 73 S.Ct. 1031. But Barrows provides no reasoning to support that distinction and even admits that the rule against third-party standing is "not always clearly distinguished from the constitutional limitation[s]" on standing. Ibid . The sole authority Barrows cites in support of the rule's "prudential" label is a single-Justice concurrence in Ashwander v. TVA , 297 U.S. 288, 346-348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (opinion of Brandeis, J.).
Justice Brandeis' concurrence, however, raises more questions than it answers. The opinion does not directly reference third-party standing. It only obliquely refers to the concept by invoking the broader requirement *2144 that a plaintiff must "show that he is injured by [the law's] operation." Id. , at 347, 56 S.Ct. 466. Justice Brandeis claims that this requirement was adopted by the Court "for its own governance in cases confessedly within its jurisdiction." Id. , at 346, 56 S.Ct. 466. But most of the cases he cites frame the matter in terms of the Court's jurisdiction and authority; none of them invoke prudential justifications. See, e.g. , Tyler v. Judges of Court of Registration , 179 U.S. 405, 407-410, 21 S.Ct. 206, 45 L.Ed. 252 (1900) ; Hendrick v. Maryland , 235 U.S. 610, 621, 35 S.Ct. 140, 59 L.Ed. 385 (1915) ; Massachusetts v. Mellon , 262 U.S. 447, 480, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Thus, the "prudential" label for the rule against third-party standing remains a bit of a mystery.
It is especially puzzling that a majority of the Court insists on continuing to treat the rule against third-party standing as prudential when our recent decision in Lexmark Int'l, Inc. v. Static Control Components, Inc. , 572 U. S. 118, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), questioned the validity of our prudential standing doctrine more generally. In that case, we acknowledged that requiring a litigant who has Article III standing to also demonstrate "prudential standing" is inconsistent "with our recent reaffirmation of the principle that 'a federal court's "obligation" to hear and decide' cases within its jurisdiction 'is "virtually unflagging." ' " Id. , at 125-126, 134 S.Ct. 1377 (quoting Sprint Communications, Inc. v. Jacobs , 571 U.S. 69, 77, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013) ). The Court therefore suggested that the "prudential" label for these doctrines was "inapt." Lexmark , 572 U.S. at 127, n. 3, 134 S.Ct. 1377. As an example, it noted that the Court previously considered the rule against generalized grievances to be "prudential" but now recognizes that rule to be a part of Article III's case-or-controversy requirement. Ibid. The Court specifically questioned the prudential label for the rule against third-party standing, but because Lexmark did not involve any questions of third-party standing, the Court stated that "consideration of that doctrine's proper place in the standing firmament [could] await another day." Id. , at 128, n. 3, 134 S.Ct. 1377.
The Court's previous statements on the rule against third-party standing have long suggested that the "proper place" for that rule is in Article III's case-or-controversy requirement. The Court has acknowledged that the traditional rule against third-party standing is "closely related to Art[icle] III concerns." Warth v. Seldin , 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It has repeatedly noted that the rule "is not completely separable from Art[icle] III's requirement that a plaintiff have a sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." Secretary of State of Md. v. Joseph H. Munson Co. , 467 U.S. 947, 955, n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (internal quotation marks omitted); see also Barrows , supra, at 255, 73 S.Ct. 1031 (the rule against third-party standing is "not always clearly distinguished from the constitutional limitation[s]" on standing). Moreover, the Court has even expressly stated that the rule against third-party standing is "grounded in Art[icle] III limits on the jurisdiction of federal courts to actual cases and controversies." New York v. Ferber , 458 U.S. 747, 767, n. 20, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).
And most recently, in Spokeo, Inc. v. Robins , 578 U. S. ----, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016), the Court appeared to incorporate the rule against third-party standing into its understanding of Article III's injury-in-fact requirement. There, the Court stated that to establish an injury-in-fact a plaintiff must "show that he or she suffered 'an invasion of a legally protected *2145 interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " Id., at ----, 136 S.Ct., at (slip op., at 7) (quoting Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). The Court further explained that whether a plaintiff "alleges that [the defendant] violated his statutory rights " rather than "the statutory rights of other people " was a question of "particularization" for an Article III injury. 578 U. S., at ----, 136 S.Ct., at (slip op., at 8) (internal quotation marks omitted). It is hard to reconcile this language in Spokeo with the plurality's assertion that third-party standing is permitted under Article III.
B
A brief historical examination of Article III's case-or-controversy requirement confirms what our recent decisions suggest: The rule against third-party standing is constitutional, not prudential. The judicial power is limited to " ' "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." ' " Id. , at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 1) (quoting Vermont Agency of Natural Resources v. United States ex rel. Stevens , 529 U.S. 765, 774, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ); see also Muskrat v. United States , 219 U.S. 346, 356-357, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Thus, to ascertain the scope of Article III's case-or-controversy requirement, "we must 'refer directly to the traditional, fundamental limitations upon the powers of common-law courts.' " Spokeo , supra, at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 2) (quoting Honig v. Doe , 484 U.S. 305, 340, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (Scalia, J., dissenting)). "One focus" of these traditional limitations was "on the particular parties before the court, and whether the rights that they [were] invoking [were] really theirs to control." Woolhandler & Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 732 (2004). An examination of these limitations reveals that a plaintiff could not establish a case or controversy by asserting the constitutional rights of others.
The limitations imposed on suits at common law varied based on the type of right the plaintiff sought to vindicate. Spokeo , 578 U. S., at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 2). The rights adjudicated by common-law courts generally fell into one of two categories: public or private. Public rights are those "owed 'to the whole community ... in its social aggregate capacity.' " Id. , at ----, 136 S.Ct., at (slip op., at 3) (quoting 4 W. Blackstone, Commentaries *5). Private rights, on the other hand, are those " 'belonging to individuals, considered as individuals.' " Spokeo , supra , at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 2) (quoting 3 Blackstone, Commentaries *2).
When a plaintiff sought to vindicate a private right, "courts historically presumed that the plaintiff suffered a de facto injury merely from having his personal, legal rights invaded." Spokeo , supra, at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 2). But a plaintiff generally "need[ed] to have a private interest of his or her own to litigate; otherwise, no sufficient interest [was] at stake on the plaintiff's side, and the clash of interests necessary for a 'Case' or 'Controversy' [did] not exist." Woolhandler & Nelson, supra , at 723. Thus, 19th-century judges uniformly refused to "listen to an objection made to the constitutionality of an act by a party whose rights" were not at issue. Clark , 176 U.S. at 118, 20 S.Ct. 284 (internal quotation marks omitted); see also, e.g. , Tyler , 179 U.S. at 406-407, 21 S.Ct. 206 ;
*2146 Supervisors v. Stanley , 105 U.S. 305, 311, 26 L.Ed. 1044 (1882) ; United States v. Ferreira , 13 How. 40, 51-52, 14 L.Ed. 40 (1852) ; Owings v. Norwood's Lessee , 5 Cranch 344, 348, 9 U.S. 344, 3 L.Ed. 120 (1809) (Marshall, C. J.); In re Wellington , 33 Mass. 87, 96 (1834) (Shaw, C. J.).[2]
Moreover, it was not enough for a plaintiff to allege damnum -i.e. , real-world damages or practical injury-if the law he was challenging did not violate a legally protected interest of his own. At common law, this sort of "factual harm without a legal injury was damnum absque injuria and provided no basis for relief." Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. 275, 280-281 (2008). As Justice Dodderidge explained in 1625, "injuria & damnum are the two grounds for the having [of] all actions, and without [both of] these, no action lieth." Cable v. Rogers , 3 Bulst. 311, 312, 81 Eng. Rep. 259. In the 18th century, many common-law courts ceased requiring damnum in suits alleging violations of private rights. See, e.g., Ashby v. White , 2 Raym. Ld. 938, 92 Eng. Rep. 126, 137 (K. B.) (Holt, C. J.), aff'd, 3 Raym. Ld. 320, 92 Eng. Rep. 710, 712 (H. L. 1703); see also Webb v. Portland Mfg. Co. , 29 F.Cas. 506, 507, (No. 17322) (CC Me. 1838) (Story, J.). But they continued to require legal injury, adhering to the "obvious" and "ancient maxim" that one's real-world damages alone cannot "lay the foundation of an action." Parker v. Griswold , 17 Conn. 288, 302-303 (1846). Thus, a plaintiff had to assert "[a]n injury, [which,] legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right." Id. , at 302.
This brief historical review demonstrates that third-party standing is inconsistent with the case-or-controversy requirement of Article III. When a private plaintiff seeks to vindicate someone else's legal injury, he has no private right of his own genuinely at stake in the litigation. Even if the plaintiff has suffered damages as a result of another's legal injury, he has no standing to challenge a law that does not violate his own private rights.
C
Applying these principles to the case at hand, plaintiffs lack standing under Article III and we, in turn, lack jurisdiction to decide these cases. Thus, "[i]n light of th[e] 'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of [an] important dispute and to "settle" it for the sake of convenience and efficiency.' " Hollingsworth v. Perry , 570 U.S. 693, 704-705, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013) (ROBERTS, C. J., for the Court) (quoting Raines v. Byrd , 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ).
1
Contrary to the plurality's assertion otherwise, ante , at 2150, abortionists' standing to assert the putative rights of their clients has not been settled by our precedents. It is true that this Court has reflexively allowed abortionists and abortion clinics to vicariously assert a woman's putative right to abortion. But oftentimes the Court has *2147 not so much as addressed standing in those cases. See, e.g., Whole Woman's Health v. Hellerstedt , 579 U. S. ----, ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016); Gonzales v. Carhart , 550 U. S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ; Ayotte v. Planned Parenthood of Northern New Eng. , 546 U. S. 320, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ; Stenberg v. Carhart , 530 U. S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ; Mazurek v. Armstrong , 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam ); Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). And questions "merely lurk[ing] in the record, neither brought to the attention of the court nor ruled upon," are not "considered as having been so decided as to constitute precedents." Webster v. Fall , 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ; see also Illinois Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 183, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). Specifically, when it comes "to our own judicial power or jurisdiction, this Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio ." United States v. L. A. Tucker Truck Lines, Inc. , 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (citing United States v. More , 3 Cranch 159, 7 U.S. 159, 2 L.Ed. 397 (1805) (Marshall, C. J., for the Court)).
The first-and only-time the Court squarely addressed this question with a reasoned decision was in Singleton v. Wulff , 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).[3] In that case, a fractured Court concluded that two abortionists had standing to challenge a State's refusal to provide Medicaid reimbursements for abortions. Perfunctorily applying this Court's requirements for third-party standing, Justice Blackmun, joined by three other Justices, asserted that abortionists generally had standing to litigate their clients' rights. Id. , at 113-118, 96 S.Ct. 2868 (plurality opinion). Justice Stevens concurred on considerably narrower grounds, reasoning that the abortionists had standing because they had a financial stake in the outcome of the litigation and sought to vindicate their own constitutional rights as well. Id., at 121, 96 S.Ct. 2868 (opinion concurring in part). Notably, Justice Stevens declined to join the plurality's discussion of third-party standing, explaining that he was "not sure whether [that analysis] would, or should, *2148 sustain the doctors' standing, apart from" their own legal rights and financial interests being at stake in that specific case. Id., at 122, 96 S.Ct. 2868. The four remaining Justices dissented in part, concluding that the abortionists lacked standing to litigate the rights of their clients. Id., at 122-131, 96 S.Ct. 2868 (Powell, J., concurring in part and dissenting in part). Because Justice Stevens' opinion "concurred in the judgmen[t] on the narrowest grounds," it is the controlling opinion regarding abortionists' third-party standing. Marks v. United States , 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).[4]
To the extent Justice Stevens' opinion could be read as concluding that abortionists have standing to vicariously assert their clients' rights so long as the abortionists establish standing on their own legal claims, his position has been abrogated by this Court's more recent decisions, which have "confirm[ed] that a plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. , 547 U.S. at 352, 126 S.Ct. 1854. But more importantly, Justice Stevens' opinion does not support the abortionists in these cases, because his opinion rested on case-specific facts not implicated here-namely, the fact that the abortionists would directly receive Medicaid payments from the defendant agency if they prevailed and that they asserted violations of their own constitutional rights. In these cases, there is no dispute that the abortionists' sole claim before this Court is that Louisiana's law violates the purported substantive due process rights of their clients .
2
Under a proper understanding of Article III, plaintiffs lack standing. As explained above, in suits seeking to vindicate private rights, the owners of those rights can establish a sufficient injury simply by asserting that their rights have been violated. Constitutional rights are generally considered "private rights" to the extent they " ' belon[g] to individuals, considered as individuals.' " Spokeo , 578 U. S., at ----, 136 S.Ct., at (THOMAS, J., concurring) (slip op., at 3) (quoting 3 Blackstone, Commentaries *2); see also United States v. Sineneng-Smith , 590 U. S. ----, ----, 140 S.Ct. 1575, --- L.Ed.2d ---- (2020) (THOMAS, J., concurring) (slip op., at 8). And the purported substantive due process right to abort an unborn child is no exception-it is an individual right that is inherently personal. After all, the Court "creat[ed the] right" based on the notion that abortion " ' involv[es] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy.' " Whole Women's Health , 579 U. S., at ----, 136 S.Ct., at (THOMAS, J., dissenting) (slip op., at 5) (quoting Casey , 505 U.S. at 851, 112 S.Ct. 2791 (majority opinion)). Because this right belongs to the woman making that choice, not to those who provide abortions, plaintiffs cannot establish a personal legal injury by asserting that this right has been violated.[5]
*2149 The only injury asserted by plaintiffs in this suit is the possibility of facing criminal sanctions if the abortionists conduct abortions without admitting privileges in violation of the law. See Response and Reply for Petitioners (No. 18-1460)/Cross- Respondents (No. 181323), p. 34, 764 Fed.Appx. 224. But plaintiffs do not claim any right to provide abortions, nor do they contest that the State has authority to regulate such procedures.[6] They have therefore demonstrated only real-world damages (or more accurately, the possibility of real-world damages), but no legal injury, or "invasion of a legally protected interest," that belongs to them. Spokeo , supra, at ----, 136 S.Ct., at (slip op., at 7) (internal quotation marks omitted). Thus, under a proper understanding of Article III, plaintiffs lack standing and, consequently, this Court lacks jurisdiction.
II
Even if the plaintiffs had standing, the Court would still lack the authority to enjoin Louisiana's law, which represents a constitutionally valid exercise of the State's traditional police powers. The plurality and THE CHIEF JUSTICE claim that the Court's judgment is dictated by "our precedents," particularly Whole Woman's Health . Ante , at 2131 - 2132 (plurality opinion); see also ante, at 2133 - 2134, 2138 - 2142 (ROBERTS, C. J., concurring in judgment). For the detailed reasons explained by Justice ALITO, this is not true. Post , at 2153 - 2165 (dissenting opinion).
But today's decision is wrong for a far simpler reason: The Constitution does not constrain the States' ability to regulate or even prohibit abortion. This Court created the right to abortion based on an amorphous, unwritten right to privacy, which it grounded in the "legal fiction" of substantive due process, McDonald v. Chicago , 561 U.S. 742, 811, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). As the origins of this jurisprudence readily demonstrate, the putative right to abortion is a creation that should be undone.
A
The Court first conceived a free-floating constitutional right to privacy in Griswold v. Connecticut , 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In that case, the Court declared unconstitutional a state law prohibiting the use of contraceptives, finding that it violated a married couple's "right of privacy." Id. , at 486, 85 S.Ct. 1678. The Court explained that this right could be found in the "penumbras" of five different Amendments to the Constitution-the First, Third, Fourth, Fifth, and Ninth. Id., at 484, 85 S.Ct. 1678. Rather than explain what free speech or the quartering of troops had to do with contraception, the Court simply declared that these rights had created "zones of privacy" with their "penumbras," which were "formed by emanations from those guarantees that help give them life and substance." Ibid . This reasoning is as mystifying as it is baseless.
As Justice Black observed in his dissent, this general "right of privacy" was never before considered a constitutional guarantee protecting citizens from governmental intrusion. Id., at 508-510, 85 S.Ct. 1678. Rather, the concept was one of tort law, *2150 championed by Samuel Warren and the future Justice Louis Brandeis in their 1890 Harvard Law Review article entitled, " The Right to Privacy." 4 Harv. L. Rev. 193. Over 20 years after the Fourteenth Amendment was ratified and a century after the Bill of Rights was adopted, Warren and Brandeis were among the first to advocate for this privacy right in the context of tort relief for those whose personal information and private affairs were exploited by others. Id., at 193, 195-196, 214-220. By "exalting a phrase ... used in discussing grounds for tort relief, to the level of a constitutional rule," the Court arrogated to itself the "power to invalidate any legislative act which [it] find[s] irrational, unreasonable[,] or offensive" as an impermissible "interfere[nce] with 'privacy.' " Griswold, supra , at 510, n. 1, 511, 85 S.Ct. 1678 (Black, J., dissenting).
Just eight years later, the Court utilized its newfound power in Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There, the Court struck down a Texas law restricting abortion as a violation of a woman's constitutional "right of privacy," which it grounded in the "concept of personal liberty" purportedly protected by the Due Process Clause of the Fourteenth Amendment. Id. , at 153, 93 S.Ct. 705. The Court began its legal analysis by openly acknowledging that the Constitution's text does not "mention any right of privacy." Id., at 152, 93 S.Ct. 705. The Court nevertheless concluded that it need not bother with our founding document's text, because the Court's prior decisions-chief among them Griswold -had already divined such a right from constitutional penumbras. Roe , 410 U.S. at 152, 93 S.Ct. 705. Without any legal explanation, the Court simply concluded that this unwritten right to privacy was "broad enough to encompass a woman's [abortion] decision." Id. , at 153, 93 S.Ct. 705.
B
Roe is grievously wrong for many reasons, but the most fundamental is that its core holding-that the Constitution protects a woman's right to abort her unborn child-finds no support in the text of the Fourteenth Amendment. Roe suggests that the Due Process Clause's reference to "liberty" could provide a textual basis for its novel privacy right. Ibid . But that Clause does not guarantee liberty qua liberty. Rather, it expressly contemplates the deprivation of liberty and requires only that such deprivations occur through "due process of law." Amdt. 14, § 1. As I have previously explained, there is " 'considerable historical evidence support[ing] the position that "due process of law" was [originally understood as] a separation-of-powers concept ... forbidding only deprivations not authorized by legislation or common law.' " Johnson v. United States , 576 U. S. 591, 623, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015) (opinion concurring in judgment) (quoting D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, p. 272 (1985)). Others claim that the original understanding of this Clause requires that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review." Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012). But, whatever the precise requirements of the Due Process Clause, "the notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words." McDonald , 561 U.S. at 811, 130 S.Ct. 3020 (opinion of THOMAS, J.).
*2151 More specifically, the idea that the Framers of the Fourteenth Amendment understood the Due Process Clause to protect a right to abortion is farcical. See Roe , 410 U.S. at 174-175, 93 S.Ct. 705 (Rehnquist, J., dissenting). In 1868, when the Fourteenth Amendment was ratified, a majority of the States and numerous Territories had laws on the books that limited (and in many cases nearly prohibited) abortion. See id., at 175, n. 1, 93 S.Ct. 705.[7] It would no doubt shock the public at that time to learn that one of the new constitutional Amendments contained hidden within the interstices of its text a right to abortion. The fact that it took this Court over a century to find that right all but proves that it was more than hidden-it simply was not (and is not) there.
C
Despite the readily apparent illegitimacy of Roe , "the Court has doggedly adhered to [its core holding] again and again, often to disastrous ends." Gamble v. United States , 587 U. S. ----, ----, 139 S.Ct. 1960, 204 L.Ed.2d 322 (2019) (THOMAS, J., concurring) (slip op., at 16). In doing so, the Court has repeatedly invoked stare decisis . See, e.g. , Casey , 505 U.S. at 854-869, 112 S.Ct. 2791. And today, a majority of the Court insists that this doctrine compels its result. See ante , at 2133 (plurality opinion); ante, at 2133 - 2134, 2138 - 2139 (opinion of ROBERTS, C. J.).
The Court's current "formulation of the stare decisis standard does not comport with our judicial duty under Article III," which requires us to faithfully interpret the Constitution. Gamble , 587 U. S., at ----, 139 S.Ct., at (THOMAS, J., concurring) (slip op., at 2). Rather, when our prior decisions clearly conflict with the text of the Constitution, we are required to "privilege [the] text over our own precedents." Id., at ----, 139 S.Ct., at (slip op., at 10). Because Roe and its progeny are premised on a "demonstrably erroneous interpretation of the Constitution," we should not apply them here. 587 U. S., at ----, 139 S.Ct., at (THOMAS, J., concurring) (slip op., at 10).
Even under THE CHIEF JUSTICE's approach to stare decisis , continued adherence to these precedents cannot be justified. Stare decisis is "not an inexorable command," ante , at 2134 (internal quotation marks omitted), and this Court has recently overruled a number of poorly reasoned precedents that have proved themselves *2152 to be unworkable, see Knick v. Township of Scott , 588 U. S. ----, ---- - ----, 139 S.Ct. 2162, 204 L.Ed.2d 558 (2019) (ROBERTS, C. J., for the Court) (slip op., at 20-23); Franchise Tax Bd. of Cal. v. Hyatt , 587 U. S. ----, ---- - ----, 139 S.Ct. 1485, 203 L.Ed.2d 768 (2019) (slip op., at 16-17); Janus v. State, County, and Municipal Employees , 585 U. S. ----, ---- - ----, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018) (slip op., at 33-47). As I have already demonstrated, supra, at 2149 - 2151, Roe 's reasoning is utterly deficient-in fact, not a single Justice today attempts to defend it.
Moreover, the fact that no five Justices can agree on the proper interpretation of our precedents today evinces that our abortion jurisprudence remains in a state of utter entropy. Since the Court decided Roe , Members of this Court have decried the unworkability of our abortion case law and repeatedly called for course corrections of varying degrees. See, e.g., 410 U.S. at 171-178, 93 S.Ct. 705 (Rehnquist, J., dissenting); Doe v. Bolton , 410 U.S. 179, 221-223, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (White, J., dissenting); Akron v. Akron Center for Reproductive Health, Inc. , 462 U.S. 416, 452-466, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting); Thornburgh v. American College of Obstetricians and Gynecologists , 476 U.S. 747, 785-797, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (White, J., dissenting); Webster v. Reproductive Health Services , 492 U.S. 490, 532-537, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Scalia, J., concurring in part and concurring in judgment); Casey , 505 U.S. at 944-966, 112 S.Ct. 2791 (Rehnquist, C. J., concurring in judgment in part and dissenting in part); id., at 979-1002, 112 S.Ct. 2791 (Scalia, J., concurring in judgment in part and dissenting in part); Stenberg , 530 U.S. at 953-956, 120 S.Ct. 2597 (Scalia, J., dissenting); id., at 980-983, 120 S.Ct. 2597 (THOMAS, J., dissenting); Whole Woman's Health , 579 U. S., at ---- - ----, 136 S.Ct., at (THOMAS, J., dissenting) (slip op., at 5-11). In Casey , the majority claimed to clarify this "jurisprudence of doubt," 505 U.S. at 844, 112 S.Ct. 2791, but our decisions in the decades since then have only demonstrated the folly of that assertion, see Stenberg , 530 U.S. at 953-956, 120 S.Ct. 2597 (Scalia, J., dissenting); id., at 960-979, 120 S.Ct. 2597 (Kennedy, J., dissenting); Whole Woman's Health , supra , at ---- - ----, 136 S.Ct. 2292 (THOMAS, J., dissenting) (slip op., at 5-11). They serve as further evidence that this Court's abortion jurisprudence has failed to deliver the " 'principled and intelligible' " development of the law that stare decisis purports to secure. Ante, at 2134 (opinion of ROBERTS, C. J.) (quoting Vasquez v. Hillery , 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) ).
THE CHIEF JUSTICE advocates for a Burkean approach to the law that favors adherence to " 'the general bank and capital of nations and of ages.' " Ante , at 2134 (quoting 3 E. Burke, Reflections on the Revolution in France 110 (1790)). But such adherence to precedent was conspicuously absent when the Court broke new ground with its decisions in Griswold and Roe . And no one could seriously claim that these revolutionary decisions-or Whole Woman's Health , decided just four Terms ago-are part of the "inheritance from our forefathers ," fidelity to which demonstrates "reverence to antiquity." E. Burke, Reflections on the Revolution in France 27-28 (J. Pocock ed. 1987).
More importantly, we exceed our constitutional authority whenever we "appl[y] demonstrably erroneous precedent instead of the relevant law's text." Gamble , supra, at ----, 139 S.Ct., at (THOMAS, J., concurring) (slip op., at 2). Because we can reconcile neither Roe nor its progeny with *2153 the text of our Constitution, those decisions should be overruled.
* * *
Because we lack jurisdiction and our abortion jurisprudence finds no basis in the Constitution, I respectfully dissent.[8]
Justice ALITO, with whom Justice GORSUCH joins, with whom Justice THOMAS joins except as to Parts III-C and IV-F, and with whom Justice KAVANAUGH joins as to Parts I, II, and III, dissenting.
The majority bills today's decision as a facsimile of Whole Woman's Health v. Hellerstedt , 579 U. S. ----, ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), and it's true they have something in common. In both, the abortion right recognized in this Court's decisions is used like a bulldozer to flatten legal rules that stand in the way.
In Whole Woman's Health , res judicata and our standard approach to severability were laid low. Even Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), was altered.
Today's decision claims new victims. The divided majority cannot agree on what the abortion right requires, but it nevertheless strikes down a Louisiana law, Act 620, that the legislature enacted for the asserted purpose of protecting women's health. To achieve this end, the majority misuses the doctrine of stare decisis , invokes an inapplicable standard of appellate review, and distorts the record.
The plurality eschews the constitutional test set out in Casey and instead employs the balancing test adopted in Whole Woman's Health. The plurality concludes that the Louisiana law does nothing to protect the health of women, but that is disproved by substantial evidence in the record. And the plurality upholds the District Court's finding that the Louisiana law would cause a drastic reduction in the number of abortion providers in the State even though this finding was based on an erroneous legal standard and a thoroughly inadequate factual inquiry.
THE CHIEF JUSTICE stresses the importance of stare decisis and thinks that precedent, namely Whole Woman's Health, dooms the Louisiana law. But at the same time, he votes to overrule Whole Woman 's Health insofar as it changed the Casey test.
Both the plurality and THE CHIEF JUSTICE hold that abortion providers can invoke a woman's abortion right when they attack state laws that are enacted to protect a woman's health. Neither waiver nor stare decisis can justify this holding, which clashes with our general rule on third-party standing. And the idea that a regulated party can invoke the right of a third party for the purpose of attacking legislation enacted to protect the third party is stunning. Given the apparent conflict of interest, that concept would be rejected out of hand in a case not involving abortion.
For these reasons, I cannot join the decision of the Court. I would remand the case to the District Court and instruct that court, before proceeding any further, to require the joinder of a plaintiff with standing. If a proper plaintiff is added, the *2154 District Court should conduct a new trial and determine, based on proper evidence, whether enforcement of Act 620 would diminish the number of abortion providers in the State to such a degree that women's access to abortions would be substantially impaired. In making that determination, the court should jettison the nebulous "good faith" test that it used in judging whether the physicians who currently lack admitting privileges would be able to obtain privileges and thus continue to perform abortions if Act 620 were permitted to take effect. Because the doctors in question (many of whom are or were plaintiffs in this case) stand to lose, not gain, by obtaining privileges, the court should require the plaintiffs to show that these doctors sought admitting privileges with the degree of effort that they would expend if their personal interests were at stake.
I
Under our precedent, the critical question in this case is whether the challenged Louisiana law places a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Casey , 505 U.S. at 877, 112 S.Ct. 2791 (plurality opinion). If a law like that at issue here does not have that effect, it is constitutional. Id ., at 884, 112 S.Ct. 2791 (joint opinion of O'Connor, Kennedy, and Souter, JJ.).
The petitioners urge us to adopt a rule that is more favorable to abortion providers. At oral argument, their attorney maintained that a law that has no effect on women's access to abortion is nevertheless unconstitutional if it is not needed to protect women's health. See Tr. of Oral Arg. 18-19. Of course, that is precisely the argument one would expect from a business that wishes to be free from burdensome regulations. But unless an abortion law has an adverse effect on women , there is no reason why the law should face greater constitutional scrutiny than any other measure that burdens a regulated entity in the name of health or safety. See Casey , 505 U.S. at 884-885, 112 S.Ct. 2791 (joint opinion). Many state and local laws that are justified as safety measures rest on debatable empirical grounds. But when a party saddled with such restrictions challenges them as a violation of due process, our cases call for the restrictions to be sustained if "it might be thought that the particular legislative measure was a rational way" to serve a valid interest. See Williamson v. Lee Optical of Okla., Inc. , 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The test that petitioners advocate would give abortion providers an unjustifiable advantage over all other regulated parties, and for that reason, it was rejected in Casey . See 505 U.S. at 851, 112 S.Ct. 2791 (majority opinion).
Casey also rules out the balancing test adopted in Whole Woman's Health. Whole Woman's Health simply misinterpreted Casey, and I agree that Whole Woman's Health should be overruled insofar as it changed the Casey test. Unless Casey is reexamined-and Louisiana has not asked us to do that-the test it adopted should remain the governing standard.
II
Because the plurality adheres to the balancing test adopted in Whole Woman's Health , it considers whether the Louisiana law helps to protect the health of women seeking abortions, and it concludes that "nothing in the record indicates that the background vetting for admitting privileges adds significantly to the vetting that the State Board of Medical Examiners already provides." Ante , at 2131. THE CHIEF JUSTICE seems to agree, ante , at 2140 - 2141 (opinion concurring in judgment), although it is unclear why this issue matters under the test he favors.
*2155 In any event, contrary to the view taken by the plurality and (seemingly) by THE CHIEF JUSTICE, there is ample evidence in the record showing that admitting privileges help to protect the health of women by ensuring that physicians who perform abortions meet a higher standard of competence than is shown by the mere possession of a license to practice. In deciding whether to grant admitting privileges, hospitals typically undertake a rigorous investigative process to ensure that a doctor is responsible and competent and has the training and experience needed to perform the procedures for which the privileges are sought. As the Fifth Circuit explained, "hospitals verify an applicant's surgical ability, training, education, experience, practice record, and criminal history. These factors are reviewed by a board of multiple physicians." June Medical Services, L. L. C. v. Gee , 905 F.3d 787, 805, n. 53 (2018).
The standards used by the great majority of hospitals in deciding whether to grant privileges clearly show that hospitals demand proof of a higher level of competence. The Joint Commission, a nonprofit organization that accredits healthcare institutions, has issued standards for granting admitting privileges, and all of the hospitals whose rules are relevant here (and the vast majority of Louisiana hospitals) comply with those standards.[1] These standards call for an examination of each applicant's licensure, education, training, and current competence. See Joint Commission, 2020 Hospital Accreditation Standards, pp. MS-23, 25, 26, 29. They require an examination of a doctor's health records, clinical data on performance, and peer recommendations, and they demand that a hospital make a careful assessment of the procedures a physician may perform. Ibid .
Dr. Robert Marier, the former director of the Louisiana Board of Medical Examiners (and the former dean of Louisiana State University Medical School), testified that the process conducted by hospitals in deciding whether to grant admitting privileges is "the primary way of determining competency." App. 818. That process, he explained, "thoroughly vet[s] the qualifications of [applicants] to ensure that [they] are competent to provide the services that are in question." Ibid .
June Medical's expert, Dr. Eva Pressman, agreed that "admitting privileges can serve the function of providing an evaluation mechanism for physician competency." Id ., at 1042, 1091; Record 10864. Doe 3, one of the doctors who currently performs abortions in Louisiana, also acknowledged the credentialing value of admitting privileges, App. 247-248, as did Doe 4, another Louisiana abortion doctor, Record 14155.
Although the plurality contends that the review conducted by hospitals adds little to the vetting undertaken by the State Board of Medical Examiners (Board), that is not true. Hospitals look beyond the mere possession of a license, and they do that for very obvious reasons. If nothing else, their review process serves the hospitals' interests by diminishing the risk of awards for malpractice committed by doctors practicing on their premises. In Louisiana, hospitals that perform negligent credentialing cannot benefit from the State's medical malpractice cap. See Billeaudeau v. Opelousas General Hospital Auth. , 20160846, p. 21 (La. 10/19/16), 218 So.3d 513, 527. In addition, a hospital's "Medicare participation *2156 and other certifications depend on completing the credentialing process."[2]
The review conducted by hospitals goes beyond that of the Board in another way: it is continuous. Under the Joint Commission Standards, hospitals must monitor physicians with admitting privileges and can therefore make a running assessment of their competence. See Record 11850. The Board, on the other hand, conducts an inquiry before initially issuing a license, but the annual license renewal process entails nothing more than completing a standard form, paying the required fee, and documenting a certain number of continuing medical education credits. See 46 La. Admin. Code, pt. XLV, § 417 (2020).
Because hospitals continue to evaluate doctors after privileges are granted, they may discover information that assists the Board in carrying out its responsibilities. In the past, hospitals have forwarded such information to the Board, and such referrals have led the Board to take serious disciplinary actions.[3]
The record shows that the vetting conducted by hospitals goes far beyond what is done at Louisiana abortion clinics. Some clinics demand nothing more than possession of a license. Take the example of petitioner June Medical. Doe 3, the only person at that clinic who evaluates applicants, testified that he does not perform background checks of any kind, not even criminal records checks. App. 249-250. In the past, Doe 3 hired a radiologist and ophthalmologist to perform abortions. Id ., at 249.
Delta Clinic in Baton Rouge and Women's Clinic in New Orleans have similarly lax practices. Leroy Brinkley, the president of both clinics, testified before a Pennsylvania grand jury that, in making hiring decisions, " 'I don't judge the license. If they have a license and the state gave the license, it's not for me to determine if they are capable.' "[4] A " 'background check,' " he said, is not within his " 'framework.' "[5]
Doe 4, who practiced at the now-defunct Causeway Clinic near New Orleans, recounted the meager vetting that occurred when he was hired at that facility. He had to produce a valid medical license and DEA license but was not required "to undergo anything similar to review by a credentials committee." Record 14156.
In light of these practices, it is no surprise that the Louisiana Department of Health has issued Statements of Deficiency against abortion facilities for failing to adopt " 'a detailed credentialing process for physicians,' " failing to investigate " 'possible restrictions' " on physicians' licenses, and failing to look into " 'evidence of prior malpractice claims/settlements.' "[6]
Louisiana adopted Act 620 in the aftermath of the Kermit Gosnell grand jury report, which expounded on the failures of regulatory oversight that allowed Gosnell's practices to continue for an extended period. See Report of Grand Jury in *2157 No. 0009901-2008 (1st Jud. Dist. Pa., Jan. 14, 2011). The grand jury concluded that closer supervision would have uncovered Gosnell's egregious health and safety violations. Gosnell had a medical license, but it is doubtful that any hospital would have given him admitting privileges.
In sum, contrary to the plurality's assertion, there is ample evidence in the record showing that requiring admitting privileges has health and safety benefits. There is certainly room for debate about the need for this requirement, but under our case law, this Court's task is not to ascertain whether a law "adds significantly" to the existing regulatory framework. Instead, when confronted with a genuine dispute about a law's benefits, we have afforded legislatures "wide discretion" in assessing whether a regulation serves a legitimate medical need and is medically reasonable even in the face of medical and scientific uncertainty. Gonzales v. Carhart , 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ; Mazurek v. Armstrong , 520 U.S. 968, 973, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam ); Akron v. Akron Center for Reproductive Health, Inc. , 462 U.S. 416, 458, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting) ("[L]egislatures are better suited" than courts "to make the necessary factual judgments in this area"); accord, Barsky v. Board of Regents of Univ. of N. Y. , 347 U.S. 442, 451, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (State has "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine). Louisiana easily satisfied this standard.
For these reasons, both the plurality and THE CHIEF JUSTICE err in concluding that the admitting-privileges requirement serves no valid purpose.
III
They also err in their assessment of Act 620's likely effect on access to abortion. They misuse the doctrine of stare decisis and the standard of appellate review for findings of fact.
A
Stare decisis is a major theme in the plurality opinion and that of THE CHIEF JUSTICE. Both opinions try to create the impression that this case is the same as Whole Woman's Health and that stare decisis therefore commands the same result. In truth, however, the two cases are very different. While it is certainly true that the Texas and Louisiana statutes are largely the same, the two cases are not. The decision in Whole Woman's Health was not based on the face of the Texas statute, but on an empirical question, namely, the effect of the statute on access to abortion in that State. 579 U. S., at ----, 136 S.Ct., at (slip op., at 24). The Court's answer to that question depended on numerous factors that may differ from State to State, including the demand for abortions, the number and location of abortion clinics and physicians, the geography of the State, the distribution of the population, and the ability of physicians to obtain admitting privileges. Id ., at ---- - ----, 136 S.Ct., at (slip op., at 24-26). There is no reason to think that a law requiring admitting privileges will necessarily have the same effect in every state. As a result, just because the Texas admitting privileges requirement was found by this Court, based on evidence in the record of that case, to have substantially reduced access to abortion in that State, it does not follow that Act 620 would have comparable effects in Louisiana. See id ., at ---- - ----, 136 S.Ct., at (slip op., at 22-26) (reviewing Texas record). The two States are neighbors, but they are not the same. Accordingly, the record-based empirical determination in Whole Woman's Health is not controlling here.
*2158 The suggestion that Whole Woman's Health is materially identical to this case is ironic, since the two cases differ in a way that was critical to the Court's reasoning in Whole Woman's Health, i.e., the difference between a pre-enforcement facial challenge and a post-enforcement challenge based on evidence of the law's effects. See id ., at ----, 136 S.Ct., at (slip op., at 11). Before the Texas law went into effect, abortion providers mounted an unsuccessful facial challenge, arguing that the law would drastically limit abortion access. The Fifth Circuit held that the plaintiffs had not shown that the law would create a substantial obstacle for women seeking abortions, and a final judgment was entered against them. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott , 748 F.3d 583, 590, 605 (2014). Then, after the law had been in operation for some time, many of the same plaintiffs filed a second suit and again argued that the admitting privileges requirement violated Casey . Whole Woman's Health v. Cole , 790 F.3d 563, 577, and n. 14 (CA5 2015). The State defendants sought dismissal based on the doctrine of claim preclusion, but the Whole Woman's Health majority rejected that argument. 579 U. S., at ----, 136 S.Ct., at (slip op., at 11).
Why? Two words: "changed circumstances." Id ., at ----, 136 S.Ct., at (slip op., at 13). According to the Court, the pre-enforcement facial challenge was not the same "claim" as the post-enforcement claim because the "postenforcement consequences" of the challenged Texas law were "unknowable before [the law] went into effect." Id ., at ----, 136 S.Ct., at (slip op., at 14) (emphasis added); see also ibid. ("[I]t was still unclear how many clinics would be affected"); id ., at ----, 136 S.Ct., at (slip op., at 12) (discussing "new material facts"); id ., at ----, 136 S.Ct., at (slip op., at 14) (recounting "later, concrete factual developments").
The present case is in the same posture as the pre-enforcement facial challenge to the Texas law, and it should therefore be obvious that this Court's decision in Whole Woman's Health is not controlling.
B
1
Aside from suggesting that Whole Woman's Health is dispositive, the plurality and THE CHIEF JUSTICE provide one other reason for concluding that Act 620, if allowed to go into effect, would create a substantial obstacle for women seeking abortions. Pointing to the District Court's finding that the Louisiana law would have a drastic effect on abortion access, June Medical Services, LLC v. Kliebert , 250 F.Supp.3d 27, 87 (MD La. 2017), the plurality and THE CHIEF JUSTICE note that findings of fact may be overturned only if clearly erroneous, and they see no such error here. Ante , at 2120 - 2121 (opinion of BREYER, J.); ante , at 2141 - 2142 (opinion of ROBERTS, C. J.). In taking this approach, they overlook the flawed legal standard on which the District Court's finding depends, and they ignore the gross deficiencies of the evidence in the record.
Because the Louisiana law was not allowed to go into effect for any appreciable time, it was necessary for the District Court to predict what its effects would be. Attempting to do that, the court apparently concluded that none of the doctors who currently perform abortions in the State would be replaced if the admitting privileges requirement forced them to leave abortion practice. 250 F.Supp.3d at 82. That inference is debatable, as it primarily rests on the anecdotal testimony of June Medical's administrator. See id ., at 81-82 ; App. 113-114. Neither the plurality nor THE CHIEF JUSTICE explains why it should be accepted. That alone casts doubt *2159 on the finding to which the majority defers, but the problems with the finding do not stop there.
The finding was based on a fundamentally flawed test. In attempting to ascertain how many of the doctors who perform abortions in the State would have to leave abortion practice for lack of admitting privileges, the District Court received evidence in a variety of forms-some live testimony, but also deposition transcripts, declarations, and even letters from counsel-about the doctors' unsuccessful efforts to obtain privileges. The District Court considered whether these doctors had proceeded in "good faith"; it found that they all met that standard; and it therefore concluded that the law would leave the State with very few abortion providers.
2
Under the reasoning just described, the factual finding on which the plurality and THE CHIEF JUSTICE rely-that the Louisiana law would drastically reduce access to abortion in the State-depends on the District Court's finding that the doctors in question exercised "good faith" in their quest for privileges, but that test is woefully deficient.
It has aptly been said that "good faith" " 'is an elusive idea, taking on different meanings and emphases as we move from one context to another.' " Black's Law Dictionary 836 (11th ed. 2019). What the District Court understood the term to mean in the present context is uncertain, but this is clear: The District Court ignored a factor of the utmost importance, the incentives of the doctors in question.
When the District Court made its assessment of the doctors' "good faith," enforcement of Act 620 had been preliminarily enjoined, and the doctors surely knew that enforcement would be permanently barred if the lawsuit was successful. Thus, the doctors had everything to lose and nothing to gain by obtaining privileges.[7] Two of the doctors-Does 1 and 2-are petitioners and cross-respondents in this Court. Two others, Does 5 and 6, were plaintiffs earlier but dropped out for unexplained reasons. See App. 1327. And Doe 3, although not a plaintiff, is the medical director of June Medical, a party to this case. Id ., at 186, 206, 245.
If these doctors had secured privileges, that would have tended to defeat the lawsuit. Not only that, acquiring privileges would have subjected all the doctors to the previously described hospital monitoring, as well as any other obligations that a hospital imposed on doctors with privileges, such as providing unpaid care for the indigent. See infra , at 2163 - 2164. Thus, in light of the situation at the time when the doctors made their attempts to get privileges, they had an incentive to do as little as they thought the District Court would demand, not as much as they would if they stood to benefit from success.
Given this incentive structure, the District Court's "good faith" test was not up *2160 to the task. Although the District Court did not define exactly what the test required, "good faith" might easily mean only that a doctor lacked the subjective intent to avoid getting privileges. See Black's Law Dictionary, at 836 (defining "good faith" to mean, among other things, "absence of intent to defraud or seek unconscionable advantage").
In light of the doctors' incentives, more should have been required. The court should have asked whether the doctors' efforts to acquire privileges were equal to the efforts they would have made if they knew that their ability to continue to perform abortions was at stake. The District Court did not do that, and because its finding on abortion access rests on the wrong legal standard, it cannot stand. A finding based on an erroneous legal test is invalid; it cannot be sustained under the "clearly erroneous" rule. See Abbott v. Perez , 585 U. S. ----, ----, 138 S.Ct. 2305, 201 L.Ed.2d 714 (2018) (slip op., at 25) (" 'An appellate cour[t has] power to correct errors of law, including those that ... infect ... a finding of fact that is predicated on a misunderstanding of the governing rule of law' " (quoting Bose Corp. v. Consumers Union of United States, Inc. , 466 U.S. 485, 501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) )); Pullman-Standard v. Swint , 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (similar); see also 9C C. Wright & A. Miller, Federal Practice & Procedure § 2585, p. 392 (3d ed. 2008) (Wright & Miller) ("[I]t is axiomatic that the conclusions of law of the trial judge are not protected by the 'clearly erroneous' test").[8]
3
Not only did the District Court apply the wrong test, but the evidence in the record fails to show that the doctors made anything more than perfunctory efforts to obtain privileges.
There are three abortion clinics in Louisiana: June Medical, d/b/a Hope Clinic, in Shreveport; Delta Clinic in Baton Rouge; and Women's Clinic in New Orleans. Five doctors perform abortions at those three locations: Doe 1, Doe 2, and Doe 3 at June Medical; Doe 5 at Delta Clinic and Women's Clinic; and Doe 6 at Women's Clinic. For purposes of the analysis that follows, I assume that Doe 1 could not get privileges.[9] If we also assume that none of these doctors would be replaced if they ceased to perform abortions, the impact of the challenged law on abortion access in *2161 the State depends on the ability of four doctors to secure such privileges: Doe 2 (June Medical, Shreveport), Doe 3 (June Medical, Shreveport), Doe 5 (Delta Clinic, Baton Rouge, and Women's Clinic, New Orleans), and Doe 6 (Women's Clinic, New Orleans). As I will show, under the correct legal standard, June Medical failed to prove that Act 620 would drive these four doctors out of the abortion practice.
Doe 2 . The District Court concluded that Doe 2 made a good-faith effort to obtain privileges, and the Court now affirms that holding. Ante , at 2126. It is painfully obvious, however, that Doe 2 did not act in the way one would expect if compliance with Act 620 had been to his benefit.
E-mails in the record reveal that Doe 2 only half-heartedly applied for privileges, did so on the advice of counsel, and calculated that an outright denial would be best for his legal challenge. See App. 1452 ("The lawyers think it is important that I at least have an application pending at a hospital"); id ., at 1453 ("It may, however, be more important from a legal challenge standpoint against this Bill just to have an application pending or even denied " (emphasis added)).
Consistent with this attitude, Doe 2 declined to apply for privileges at a Shreveport-area hospital, Christus Health, where he previously had privileges while performing abortions offsite and where another doctor who performed abortions, Doe 3, maintained privileges. Id. , at 382. Doe 2 knew that Doe 3 had privileges at Christus Health, a hospital that grants "courtesy privileges," which allow doctors to admit patients but do not require a minimum number of admissions. See id ., at 406; Record 12125 (bylaws).
Doe 2's stated reasons for not applying to Christus Health are not reasons that are likely to have deterred an individual with a strong personal incentive to obtain privileges. He testified that Christus is a Catholic hospital and that he did not apply there for that reason. App. 405-406. He added that he applied to other hospitals where he "knew people and might feel more comfortable," "places that [he] thought meant something" and where he would have "the highest likelihood" of obtaining privileges. Id ., at 454. A person with a strong personal incentive to get privileges is not likely to have found these reasons sufficient to justify failing even to apply.
The District Court did not address Doe 2's failure to apply to Christus Health. 250 F.Supp.3d at 68-74. The plurality, however, argues that Christus would not have granted Doe 2 privileges because its bylaws object to abortion practice. Ante, at 2125 - 2126. But as noted, Christus Health had previously granted privileges to doctors who perform abortions. Not only did Doe 2 have privileges there while he was performing abortions, but Doe 3 has had privileges at Christus "off and on" for "30 years" and was reappointed to the Christus Health staff in 2012 and again in 2014. App. 272; Record 12102 (2012-2014); id., at 12112 (2014-2016). Throughout this time, he performed abortions. App. 206, 210.
Attempting to justify Doe 2's decision not to (re)apply to Christus, the plurality suggests that Doe 3 (and by extension Doe 2) successfully concealed their abortion practice from Christus, and that if Doe 2 had applied for privileges, Christus would have discovered that he was performing abortions and denied his application on that ground. It is doubtful that Christus was actually in the dark, and speculative that an application would have been denied for this reason.[10] But the important point *2162 is that a doctor with a strong personal incentive would have tried and not simply gone through the motions.
Instead of applying to Christus Health, Doe 2 made a formal application to Willis-Knighton Bossier City (WKBC) and an informal inquiry at University Hospital, but the record does not show that he pursued those requests with any zeal. At WKBC, he did not apply for courtesy privileges, which do not require a minimum number of admissions, Record 9642-9643, but instead sought an active staff position, id. , at 9751, and according to Doe 2, this application was doomed because he could not satisfy the minimum-admissions requirement for such a position, App. 384-390. Doe 2 later sent a three-paragraph e-mail to a WKBC e-mail address purporting to amend his 102-page application so as to seek only courtesy privileges, id. , at 1446, but the record does not reflect whether that e-mail was received or processed, and subsequent correspondence from WKBC does not acknowledge it, id. , at 1435. Doe 2 stated that he sought an active staff position "to keep [his] practice options for the future open," Record 9756, but that does not explain his lack of diligence in seeking courtesy staff privileges. Although it is true that WKBC requested inpatient records from Doe 2 for an active staff position, we do not know whether the hospital would have made the same request had Doe 2 applied for courtesy privileges. Id. , at 1435.[11]
Doe 2 said he made an informal inquiry about admitting privileges at University Hospital, where he has consulting privileges, but that the head of the OB/GYN Department, Dr. Groome, "essentially *2163 said" that the hospital would not upgrade his credentials. Id ., at 384. Doe 2 attributed this to "the political nature of what I do and the controversy of what I do." Ibid . But Doe 2 did not introduce evidence (or seek to elicit testimony from Dr. Groome) substantiating his account of this informal inquiry.
Doe 2's account raises obvious questions. Since he was already a member of the University Hospital staff, it is not apparent why the hospital would reject his request for upgraded privileges because of "the political nature" of his practice. Id ., at 440-441. And University Hospital has long been on notice of Doe 2's abortion practice. He has been affiliated with that hospital since 1979, Record 9757, and has performed abortions since 1980, id ., at 9759.
In sum, Doe 2 all but admitted in his e-mails that his efforts to obtain privileges were perfunctory; he declined to apply at a hospital where he previously had privileges; at the only hospital where he made a formal application, he sought a position he knew he could not get for lack of a sufficient number of admissions; and at one other hospital (where he already had consulting privileges) he did no more than make an informal inquiry. The District Court should have considered whether Doe 2's efforts were consistent with the conduct of a person who really wanted to get privileges.
Doe 5 . Doe 5 is an OB/GYN who performs abortions at Women's Clinic in New Orleans and Delta Clinic in Baton Rouge. Doe 5 did not testify at the hearing in District Court, but the District Court found that he proceeded in "good faith" based on a declaration and the transcript of a deposition. 250 F.Supp.3d at 75-76.
Doe 5 obtained courtesy privileges at Touro Hospital in New Orleans, see App. 1401, and therefore all agree that Act 620 would not prevent him from practicing at Women's Clinic, id ., at 1397. The remaining question is whether the law would bar him from performing abortions in Baton Rouge.
Doe 5 could continue to do that if one hospital in that area granted him admitting privileges, and Doe 5 testified that one, Woman's Hospital, will grant him privileges once he finds a doctor who is willing to cover him when he is not available. See id ., at 1334. Doe 5 asked exactly one doctor to serve as his covering physician. That does not show that he "could not find a covering physician," ante, at 2126, if he made other inquiries.
The plurality justifies Doe 5's meager effort based on pure speculation. Because the one doctor Doe 5 asked had a transfer agreement with the Baton Rouge abortion clinic, the plurality reasons that "Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would." Ante , at 2126. The plurality goes on to say that "it was well within the District Court's discretion to credit that reading of the record." Ibid .
This argument shows how far the plurality is willing to go to strike down the Louisiana law. The plurality relies on speculation about why Doe 5 made only one inquiry and why the District Court found this one inquiry sufficient. In fact, however, Doe 5 never explained why he asked only one doctor, and he never intimated that he gave up because that doctor had a transfer agreement with the clinic. Nor did the District Court rely on that inference in finding that Doe 5 exhibited good faith. See 250 F.Supp.3d at 75-76. And in any event, even if Doe 5 had a particularly strong reason to hope that the doctor he asked would agree to cover for him, it hardly follows that other inquiries would necessarily fail.
*2164 Doe 5 applied for privileges at two other area hospitals, Lane and Baton Rouge, but he did not even call back to check on them because he thought his "best chances for privileges [were] at Woman's Hospital," App. 1334, and he noted that Lane and Baton Rouge require that their doctors treat some indigent patients "for free basically" while opening themselves up to liability, id ., at 1335. Also, Doe 5 explained, Lane is "further away" from the Delta Clinic than the other hospitals. Ibid .
To sum up Doe 5's situation: The challenged law would have no effect on him if he could find a covering doctor in Baton Rouge, but he asked only one doctor. He did little to pursue applications at two other hospitals because he was not optimistic about his chances and those hospitals required a certain amount of unpaid service to the poor.
Doe 6 . Doe 6 is a Board-certified OB/GYN who practices at Women's Clinic in New Orleans. There are nine qualifying New Orleans-area hospitals, and according to his affidavit, Doe 6 made an informal inquiry at one and filed a formal application at another. The District Court found that he attempted in "good faith" to obtain admitting privileges even though Doe 6 did not testify and was never subjected to adversarial questioning. The only relevant information before the court were several paragraphs in Doe 6's declaration, id. , at 1307-1313, and hearsay in the declaration of the Women's Clinic administrator, id ., at 1119-1131; see also 250 F.Supp.3d at 76-77.
These questionable sources left many important questions unanswered, for example, why Doe 6 did not apply for privileges at Touro Hospital, where Doe 5, who also performs abortions at Women's Clinic, has privileges.
The plurality provides an explanation that is found nowhere in the record, i.e ., that Doe 6 could not get privileges at Touro because, unlike Doe 5, who performs both surgical and medication abortions, Doe 6 performs only medication abortions. Ante , at 2127 - 2128. Not only is this pure speculation, but it is not evident why this difference might matter. The plurality notes that Doe 6's medication abortion patients have never been admitted to a hospital, but the plurality also argues that very few surgical abortion patients are admitted. Ante , at 2127 - 2128, 2131. If Doe 6 had testified or been deposed, he could have been asked about his decision not to apply at Touro, but that did not occur.
Aside from Touro, there are eight other hospitals in the New Orleans area, but Doe 6 apparently made no attempt to get privileges at six of these, and nothing in the scant record explains why. He stated that he formally applied at East Jefferson Hospital and made an informal inquiry at Tulane Hospital, but much about these efforts is unknown. No representative from Tulane or East Jefferson testified or was deposed, and no documents relating to either application were offered.
With respect to Doe 6's informal inquiry at Tulane, all that the District Court had before it was a single paragraph in Doe 6's declaration in which he stated that he spoke to an unnamed individual and was told he should not bother to apply because he did not have the requisite number of admissions per year. App. 1310. Nothing in the record reveals the type of privileges about which Doe 6 inquired.
Doe 6 furnished even less information about his formal application to East Jefferson hospital-a hospital which offers courtesy privileges, and does not impose an admissions requirement for those privileges. Record 10679. In his declaration, which he signed in September 2014, Doe 6 wrote that he had applied but had not *2165 received a response. App. 1311. A few weeks later, June Medical's counsel informed the District Court by letter that Doe 6 had complied with East Jefferson's request for additional information, id ., at 54, but the record says nothing about any later developments. Presumably, East Jefferson did not grant privileges, but the record does not disclose why. Did Doe 6 provide all the information that the hospital requested and do everything else required by the application process? The record is silent, and the District Court was incurious.
Doe 3 . Doe 3, who performs abortions at the June Medical clinic in Shreveport, would not be directly affected by Act 620 because he maintains privileges at two area hospitals, Christus Health and WKBC, but he stated that he would stop performing abortions if, as a result of that law, he was left as the only abortion doctor in the northern part of the State. Id., at 236. Thus, if Doe 1 or Doe 2 got privileges and continued to perform abortions, Doe 3, according to his testimony, would remain as well.[12]
Putting all this together, it is apparent that the record does not come close to showing that Doe 2, Doe 5, and Doe 6 made the sort of effort that one would expect if their ability to continue performing abortions had depended on success. These doctors had an incentive to do the bare minimum that they thought the judge would demand-and as it turned out, the judge did not demand much, not even an appearance in his courtroom. In short, the record does not show that Act 620 would drive any of these doctors out of abortion practice, and therefore the Act would not lead Doe 3 to leave either. It follows that the District Court's finding on Act 620's likely effects cannot stand.
C
The Court should remand this case for a new trial under the correct legal standards. The District Court should apply Casey 's "substantial obstacle" test, not the Whole Woman's Health balancing test. And it should require those challenging Act 620 to demonstrate that the doctors who lack admitting privileges attempted to obtain them with the same zeal they would have exhibited if the Act were in effect and they stood to lose by failing in those efforts.
IV
On remand, the District Court should not permit June Medical to assert the rights of women wishing to obtain an abortion. The court should require the joinder of a plaintiff whose own rights are at stake. Our precedents rarely permit a plaintiff to assert the rights of a third party, and June Medical cannot satisfy our established test for third-party standing. Indeed, what June Medical seeks is something we have never allowed. It wants to rely on the rights of third parties whose interests conflict with its own.
A
The plurality holds that Louisiana waived any objection to June Medical's third-party standing, ante, at 2117 - 2118, but that is a misreading of the record. The plurality relies on a passing statement in a brief filed by the State in District Court in *2166 connection with the plaintiffs' request for a temporary restraining order, but the statement is simply an accurate statement of circuit precedent on the standing of abortion providers. See App. 44. It does not constitute a waiver.
It is true that Louisiana did not affirmatively make the third-party standing argument until it filed its cross-petition for certiorari, but "[w]e may make exceptions to our general approach to claims not raised below." Polar Tankers, Inc. v. City of Valdez , 557 U.S. 1, 14, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009). A party's failure to raise an issue does not deprive us of the power to take it up, so long as the court below has passed on the question. See Lebron v. National Railroad Passenger Corporation , 513 U.S. 374, 379, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) ("[E]ven if this were a claim not raised by petitioner below, we would ordinarily feel free to address it since it was addressed by the court below" (emphasis deleted)); S. Shapiro et al., Supreme Court Practice § 6-26(b), p. 6-104 (11th ed. 2019) (collecting cases).
In this case, no one disputes that the Fifth Circuit passed on the issue of third-party standing in Louisiana's appeal from the District Court's entry of a preliminary injunction. June Medical Services, L. L. C. v. Gee , 814 F.3d 319, 322-323 (2016). And when we granted the State's cross-petition, we took up this question and received briefing and argument on it. 589 U. S. ---- (2019).
We have a strong reason to decide the question of third-party standing because it implicates the integrity of future proceedings that should occur in this case. This case should be remanded for a new trial, and we should not allow that to occur without a proper plaintiff. Nothing compels us to forbear from addressing this issue. See Carlson v. Green , 446 U.S. 14, 17, n. 2, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) ; Shapiro, Supreme Court Practice § 6.26(h), at 6-111.
B
This case features a blatant conflict of interest between an abortion provider and its patients. Like any other regulated entity, an abortion provider has a financial interest in avoiding burdensome regulations such as Act 620's admitting privileges requirement. Applying for privileges takes time and energy, and maintaining privileges may impose additional burdens. See App. 1335. Women seeking abortions, on the other hand, have an interest in the preservation of regulations that protect their health. The conflict inherent in such a situation is glaring.
Some may not see the conflict in this case because they are convinced that the admitting privileges requirement does nothing to promote safety and is really just a ploy. But an abortion provider's ability to assert the rights of women when it challenges ostensible safety regulations should not turn on the merits of its claim.
The problem with the rule that the majority embraces is highlighted if we consider challenges to other safety regulations. Suppose, for example, that a clinic in a State that allows certified non-physicians to perform abortions claims that the State's certification requirements are too onerous and that they imperil the clinic's continued operation. Should the clinic be able to assert the rights of women in attacking this regulation, which the state lawmakers thought was important to protect women's health?
When an abortion regulation is enacted for the asserted purpose of protecting the health of women, an abortion provider seeking to strike down that law should not be able to rely on the constitutional rights *2167 of women. Like any other party unhappy with burdensome regulation, the provider should be limited to its own rights.
C
This rule is supported by precedent and follows from general principles regarding conflicts of interest. We have already held that third-party standing is not appropriate where there is a potential conflict of interest between the plaintiff and the third party. In Elk Grove Unified School Dist. v. Newdow , 542 U.S. 1, 9, 15, and n. 7, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), a potential conflict of interest between the plaintiff and his daughter arose on appeal. The father had asserted that his daughter had a constitutional right not to hear others recite the words " 'under God' " when the pledge of allegiance was recited at her public school, but the child's mother maintained that her daughter had "no objection either to reciting or hearing" the full pledge. Id. , at 5, 9, 124 S.Ct. 2301. The Court held that the father lacked prudential standing, because "the interests of this parent and this child are not parallel and, indeed, are potentially in conflict." Id. , at 15, 124 S.Ct. 2301. The lower court's judgment (based, as it was, on a presentation by a conflicted party) was therefore reversed.
Newdow recognized the seriousness of conflicts of interest in the specific context of third-party claims, but the law is always sensitive to potential conflicts when a party sues in a representative capacity. Parties naturally "tailor their own presentation to the interest that each of them has," and a conflict therefore creates "a risk that the party will not provide adequate representation of the interest of the absentee." See 7C Wright & Miller § 1909. Thus, in class-action suits, Federal Rule of Civil Procedure 23(a)(4) demands that the named plaintiff possess "the same interest and suffer the same injury" as class members. General Telephone Co. of Southwest v. Falcon , 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (internal quotation marks omitted). That requirement, we have said, "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Products, Inc. v. Windsor , 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Similarly, under Federal Rule of Civil Procedure 17(c), a party representing a minor or incompetent person may be replaced if the representative has conflicting interests. See Sam M. v. Carcieri , 608 F.3d 77, 86 (CA1 2010) ; 6A Wright & Miller § 1570. And of course, an attorney cannot represent a client if their interests conflict.[13]
D
The conflict of interest inherent in a case like this is reason enough to reject third-party standing, and our standard rules on third-party standing provide a second, independent reason. As a general rule, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin , 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). We have recognized a "limited" exception to this rule, but in order to qualify, a litigant must demonstrate (1) closeness to the third party and (2) a hindrance to the third party's ability to bring suit. Kowalski v. Tesmer , 543 U.S. 125, 129-130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) ; see also Powers v. Ohio , 499 U.S. 400, 410-411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
The record shows that abortion providers cannot satisfy either prong of this test.
*2168 First, a woman who obtains an abortion typically does not develop a close relationship with the doctor who performs the procedure. On the contrary, their relationship is generally brief and very limited. In Louisiana, a woman may make her first visit to an abortion clinic the day before the procedure, and if she goes to June Medical, she is likely to have a short meeting with a counselor, not the doctor who will actually perform the procedure. See App. 784-786. She will typically meet the abortion doctor for the first time just before the procedure, and if Doe 1's description is representative, their relationship consists of the doctor's telling the woman what he will do, offering to answer questions, informing her of his progress as the abortion is performed, and asking her to remain calm. Id ., at 688. Doe 4 testified that the surgical procedure itself takes "two or three minutes." Record 14144. Doe 3 testified that he can perform six abortions an hour and once performed 64 abortions in a 2-day period. App. 207, 243.
In the case of medication abortions, patients are required to schedule a follow-up appointment three weeks after the procedure, see id. , at 129-131, 690, but surgical abortions, which constitute the majority of the procedures at June Medical and across the State, do not require any follow-up, id ., at 691, and the great majority of women never return to the clinic, id ., at 131; accord, id ., at 1342 (Doe 5).
This description of doctor-patient interactions at June Medical is similar to those recounted in testimony heard by the legislature. See Record 11263 ("there was no doctor/patient relationship"); id. , at 11226 ("I can tell you, women I've counseled, many times they don't know who the abortion provider is"). Amici who have had abortions recount similarly distant relationships with their abortion doctors.[14] For these reasons, the first prong of the third-party standing rule cannot be met.
Nor can the second, which requires that there be a hindrance to the ability of the third party to bring suit. See Kowalski , 543 U.S. at 130, 125 S.Ct. 564. The plurality opinion in Singleton v. Wulff , 428 U.S. 106, 117, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), found that women seeking abortions were hindered from bringing suit, but the reasoning in that opinion is hard to defend. The opinion identified two purported obstacles to suits by women wishing to obtain abortions-the women's desire to protect their privacy and the prospect of mootness. Ibid . But as Justice Powell said at the time, these "alleged 'obstacles' ... are chimerical." Id ., at 126, 96 S.Ct. 2868 (opinion concurring in part and dissenting in part).
First, a woman who challenges an abortion restriction can sue under a pseudonym, and many have done so. Ibid . ("Our docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision"). Other precautions may be taken during the course of litigation to avoid revealing their identities. See App. 196.[15] And there is little reason *2169 to think that a woman who challenges an abortion restriction will have to pay for counsel. See Brief for Respondent/Cross-Petitioner 40-41.
Second, if a woman seeking an abortion brings suit, her claim will survive the end of her pregnancy under the capable-of-repetition-yet-evading-review exception to mootness. See Roe v. Wade , 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness"). To be sure, when the pregnancy terminates, an individual plaintiff 's immediate interest in prosecuting the case may diminish. But this is generally true whenever the capable-of-repetition-yet-evading-review exception applies. See 13C Wright & Miller § 3533.8 (collecting examples).
The Singleton plurality opinion is the only opinion in which any Members of this Court have ever attempted to justify third-party standing for abortion providers, and judged on its own merits, the opinion is thoroughly unconvincing.
E
The Court does not address the conflict of interest inherent in this challenge, or plaintiffs' failure to satisfy the two prongs of our third-party standing doctrine. See Kowalski , 543 U.S. at 130, 125 S.Ct. 564. Instead, the plurality says that it "is ... common" in third-party standing case law for "plaintiffs [to] challeng[e] a law ostensibly enacted to protect [a third party] whose rights they are asserting." Ante , at 2119. In support of this strange proposition, the plurality cites two of our prior decisions, but neither decision acknowledged or addressed any potential conflict of interest, and both cases involved circumstances very different from those present here. Both cases also featured facts assuring that third-party interests were fairly represented.
In the first case, Craig v. Boren , 429 U. S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the sole appellant with a live claim at the time of decision was a beer vendor who challenged a law that allowed females to purchase 3.2% beer at the age of 18 but barred males from making such purchases until they turned 21. Id ., at 193, 97 S.Ct. 451. The Court's lead explanation for its refusal to dismiss had nothing to do with the merits of the vendor's third-party standing claim. The Court noted that the other appellant, Curtis Craig, had been under the age of 21 during the proceedings below, that the appellees had not raised a standing objection below, and that they had not pressed an objection in this Court. Id. , at 192-194, 97 S.Ct. 451.
Only after this discussion did the Court say anything about the merits of the third-party claim, and even then, the Court said nothing about a conflict of interest between the vendor and underage males. The plurality now claims there was a potential conflict: Young men under the age of 21 had an interest in being barred from buying beer in order to protect themselves from their own reckless conduct. Suffice it to say that there is no indication that this *2170 supposed conflict occurred to anybody when Craig was before this Court.
The plurality's second case, Department of Labor v. Triplett , 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990), is even weaker. A state bar ethics committee filed a disciplinary proceeding in state court against a lawyer who had entered into an attorney-fee arrangement that was prohibited by a provision of the Black Lung Benefits Act. When the State Supreme Court ruled in favor of the lawyer on the ground that the provision in question violated Black Lung claimants' constitutional right to counsel, both the bar ethics committee and the Department of Labor, which had intervened in state court, successfully petitioned for review in this Court. We then held that the attorney could defend the decision below based on the rights of his client.
Triplett is inapposite here for at least two reasons. First, the lawyer in that case did not initiate the litigation. Second, because the case arose in state court, his right to invoke his client's rights in that forum was a question of state law. Had we prevented him from asserting those rights in this Court, he would have been unable to defend himself against the petitioners' arguments. And on top of all this, Triplett, as we noted in Kowalski , "involved the representation of known claimants," and that "existing attorney-client relationship [was] quite different from the hypothetical ... relationship" between the abortion providers and clients in the present case. 543 U.S. at 131, 125 S.Ct. 564. That Craig and Triplett are the best authorities the plurality can find is telling proof of the weakness of its position.
F
As THE CHIEF JUSTICE points out, stare decisis generally counsels adherence to precedent, and in deciding whether to overrule a prior decision, we consider factors beyond the strength of the precedent's reasoning. Ante , at 2112 - 2114. But here, such factors weigh in favor of overruling.
Reexamination of a precedent may be appropriate when it is an "outlier" and its reasoning cannot be reconciled with other established precedents, see Franchise Tax Bd. of Cal. v. Hyatt , 587 U. S. ----, ----, 139 S.Ct. 1485, 203 L.Ed.2d 768 (2019) (slip op., at 17) ; Janus v. State, County, and Municipal Employees , 585 U. S. ----, ----, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018) (slip op., at 43); United States v. Gaudin , 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ; Rodriguez de Quijas v. Shearson/American Express, Inc. , 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), and that is true of the rule allowing abortion providers to assert their patients' rights. The parties have not brought to our attention any other situation in which a party is allowed to invoke the right of a third party with blatantly adverse interests. The rule that the majority applies here is an abortion-only rule.
THE CHIEF JUSTICE properly notes that subsequent legal developments may support overruling a precedent, ante , at 2112 - 2114, 109 S.Ct. 1917, and that factor too is present here. Both our general standing jurisprudence and our treatment of third-party standing have changed since Singleton . We have stressed the importance of insisting that a plaintiff assert an injury that is particular to its own situation. See, e.g ., Spokeo, Inc. v. Robins , 578 U. S. ----, ----, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (slip op., at 7); Clapper v. Amnesty Int'l USA , 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) ; Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Moreover, in Kowalski , 543 U. S. 125, 125 S.Ct. 564, 160 L.Ed.2d 519, we refined our *2171 rule for third-party standing, and in Newdow , 542 U. S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98, we made it clear that a plaintiff cannot sue on behalf of a third party if the parties' interests may conflict.
The presence or absence of reliance is often a critical factor in applying the doctrine of stare decisis, see, e.g ., Franchise Tax Bd. , 587 U. S., at ----, 139 S.Ct., at (slip op., at 17) ; Janus , 585 U. S., at ----, 138 S.Ct., at (slip op., at 44) ; South Dakota v. Wayfair, Inc ., 585 U. S. ----, ---- (2018) (slip op., at 20); Hilton v. South Carolina Public Railways Comm'n , 502 U.S. 197, 206-207, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991), but neither the plurality nor THE CHIEF JUSTICE claims that any reliance interests are at stake here. Women wishing to obtain abortions have not taken any action in reliance on the ability of abortion providers to sue on their behalf, and eliminating third-party standing for providers would not interfere with the ability of women to sue. Nor does it appear that abortion providers have done anything in reliance on the special third-party standing rule they have enjoyed. If that rule were abrogated, they could still ask to intervene or appear as an amicus curiae in a suit brought by a woman, but it is deeply offensive to our rules of standing to permit them to sue in the name of their patients when they challenge laws enacted to protect their patients' safety.
On remand, the District Court should permit the joinder of a plaintiff with standing and should not proceed until such a plaintiff appears.
* * *
The decision in this case, like that in Whole Woman's Health , twists the law, and I therefore respectfully dissent.

See, e.g., Ala. Rev. Code § 3605 (1867); Terr. of Ariz., Howell Code, ch. 10, § 45 (1865); Ark. Rev. Stat., ch. 44, div. III, Art. II, § 6 (1838); 1861 Cal. Stat., ch. 521, § 45, p. 588; Colo. (Terr.) Rev. Stat. § 42 (1868); Conn. Gen. Stat., Tit. 12, §§ 22-24 (1861); Fla. Acts 1st Sess., ch. 1637, subch. III, §§ 10, 11, ch. 8, §§ 9, 10 (1868); Terr. of Idaho Laws, Crimes and Punishments § 42 (1864); Ill. Stat., ch. 30, § 47 (1868); Ind. Laws ch. LXXXI, § 2 (1859); Iowa Rev. Gen. Stat., ch. 165, § 4221 (1860); Kan. Gen. Stat., ch. 31, §§ 14, 15, 44 (1868); La. Rev. Stat., Crimes and Offenses § 24 (1856); Me. Rev. Stat., Tit. XI, ch. 124, § 8 (1857); 1868 Md. Laws ch. 179, § 2, p. 315; Mass. Gen. Stat., ch. 165, § 9 (1860); Mich. Rev. Stat., Tit. XXX, ch. 153, §§ 32, 33, 34 (1846); Terr. of Minn. Rev. Stat., ch. 100, §§ 10, 11 (1851); Miss. Rev. Code, ch. LXIV, Arts. 172, 173 (1857); Mo. Rev. Stat., Art. II, §§ 9, 10, 36 (1835); Terr. of Mont. Laws, Criminal Practice Acts § 41 (1864); Terr. of Neb. Rev. Stat., Crim. Code § 42 (1866); Terr. of Nev. Laws ch. 28, § 42 (1861); 1848 N. H. Laws ch. 743, §§ 1, 2, p. 708; 1849 N. J. Laws, pp. 266-267; 1854 Terr. of N. M. Laws ch. 3, §§ 10, 11, p. 88; 1846 N. Y. Laws ch. 22, § 1, p. 19; 1867 Ohio Laws § 2, pp. 135-136; Ore. Gen. Laws, Crim. Code, ch. XLIII, § 509 (1845-1864); 1860 Pa. Laws no. 374, §§ 87, 88, 89, pp. 404-405; Tex. Gen. Stat. Dig., Penal Code, ch. VII, Arts. 531-536 (1859); 1867 Vt. Acts & Resolves no. 57, §§ 1, 3, pp. 64-66; 1848 Va. Acts, Tit. II, ch. 3, § 9, p. 96; Terr. of Wash. Stat., ch. II, §§ 37, 38 (1854); Wis. Rev. Stat., ch. 164, §§ 10, 11, ch. 169, §§ 58, 59 (1858).

I agree with Justice ALITO's application of our precedents except in Part IV-F of his opinion, but I would not remand for further proceedings. Because plaintiffs lack standing under Article III, I would instead remand with instructions to dismiss for lack of jurisdiction. Alternatively, if I were to reach the merits because a majority of the Court concludes we have jurisdiction, I would affirm, as plaintiffs have failed to carry their burden of demonstrating that Act 620 is unconstitutional, even under our precedents.

The State has not asked the Court to depart from the Casey standard.

In my view, the District Court on remand should also address the State's new argument (raised for the first time in this Court) that these doctors and clinics lack third-party standing.

Brief for 207 Members of Congress as Amici Curiae 18-19 (lifetime ban from obstetric surgery in Louisiana); id ., at 19-20 (one-year probation of medical license).

Brief for Louisiana State Legislators as Amici Curiae 8-9; App. to id ., at 67a.

Ibid.

Id ., at 9.

Petitioners maintain that an unsuccessful admitting privileges application is a "stain" on a doctor's medical record, because the rejection could appear in a federal database and would need to be disclosed on future applications for admitting privileges. Brief for Petitioners in No. 181323, p. 41, n. 7. As the record in this case shows, there is reason to doubt that the prospect of rejection provides a sufficient incentive for doctors to pursue privileges vigorously. See infra , at 2160 - 2165. Perhaps that is because only rejections for lack of "professional competence or professional conduct" need to be disclosed to the relevant federal database. 45 C.F.R. §§ 60.12, 60.3 (2019). Petitioners also have not explained how a non-competence-based rejection would have any bearing on future applications for privileges.

The plurality claims that my criticism of the District Court's "good faith" standard "is not a legal argument," and instead reflects a view of the facts-namely that the Does acted in "bad faith." Ante , at 2124 - 2125. But the District Court used "good faith" as the legal standard to assess whether Act 620 would cause the Does to stop performing abortions. Neither the District Court nor the plurality has defined "good faith." Unless that term reflects what the doctors would have done if the incentives had been reversed-and the plurality does not argue that it does-there is a legal issue.

The Fifth Circuit concluded that it would be "nearly impossible" for Doe 1 to get privileges, June Medical Services L. L. C. v. Gee , 905 F.3d 787, 812 (2018), and for this reason, the plurality does not linger on Doe 1. Ante , at 2124. Under the correct legal standard, however, it is not at all clear that Doe 1 made the effort required, at least with respect to Christus Health in Shreveport. He applied there for courtesy privileges, received letters instructing him to pick up a badge, and when he called to clarify the meaning of letters sent to him, an unnamed doctor supposedly told him that he should apply for "some kind of a nonstaff caregiver type" position, App. 725, and he then ceased all efforts to get courtesy staff privileges at Christus, id ., at 728. A person with a strong personal incentive to obtain courtesy privileges would not necessarily have taken this somewhat cryptic advice as a definite rejection of his application.

The suggestion that Doe 2's abortion practice could have eluded Christus (and therefore that it would be an impediment to obtaining privileges again) blinks reality. There is no evidence that the hospital was unaware of Doe 2's abortion practice when he was on staff. Nor is there reason to believe that Christus would not have reviewed Doe 2's professional practice history, Record 12190-12191, or demanded disclosure of past malpractice claims at the time he held privileges there, id ., at 12194; App. 374 (medical malpractice claim against Doe 2 arising from practice at June Medical); see also supra , at 2154 - 2156 (reviewing hospital credentialing).
The notion that Doe 3's abortion practice has escaped attention for 30 years is even harder to believe. Christus has reappointed Doe 3 in recent years based on a biennial process that assesses "[p]erformance and conduct in each hospital and/or other healthcare organizatio[n]" outside of Christus. Record 12136; see also ibid . (requiring staff members to submit "reapplication form [with] complete information to update his/her file on items listed in his/her original application"). Doe 3 spends "Thursday afternoon" and "all day on Saturday" at the abortion clinic, App. 206, and therefore presumably is unavailable for his on-call duties at Christus at those times, Record 12123. Doe 3 is affiliated with the National Abortion Federation and has attended "many" of their national conferences to obtain continuing medical education credits. App. 203. And Doe 3 indicated that all eight OB/GYNs in Bossier City learned of his abortion practice when discussing a possible on-call rotation system. See id. , at 200-202. If those facts did not tip off the hospital, perhaps Christus learned about Doe 3's abortion practice when one of his patients was transferred directly from June Medical to Christus, bleeding and in need of a hysterectomy, id. , at 217-218, or when Doe 1's privileges application named Doe 3 as a peer reference, Record 13025. Whatever the Christus bylaws say, abortion practice does not appear to have presented an obstacle to a successful association with the hospital.

Each year, a physician with courtesy staff privileges at WKBC may have as many as 49 "patient contacts," which are defined as "any admission and management, consultation, procedure, response to emergency call, and newborns." Record 9628, 9642 (capitalization omitted). And contrary to the plurality's suggestion, the fact that WKBC imposes the same "[f]actors for [e]valuation" for courtesy and active staff-applicants says little, since those factors do not set out any quantum of patient records, and require only "relevant ... experience" for the position sought. Id., at 9669.

The plurality suggests that, if Doe 3 were to leave abortion practice, it would be attributable to Act 620. But even the most ardent opponents of Act 620 did not contemplate that the law would prompt abortion doctors who satisfied the law's requirements to quit. Record 11231-11234, 11291. And if this outcome was not foreseeable at the time of enactment, it is hard to see how the District Court could blame Act 620 for causing Doe 3 to leave abortion practice. Cf. Restatement (Second) of Torts § 440, §442A (1964).

See, e.g. , ABA Model Rules of Professional Conduct 1.7-1.9, 1.18 (2016).

See Brief for 2,624 Women Injured by Abortion et al. as Amici Curiae 14-22 (firsthand accounts of abortion procedures in Louisiana); Brief for Priests for Life et al. as Amici Curiae 7-8, and App. (accounts from Louisiana and other States).

Four cases to reach this Court have featured exclusively women plaintiffs. See Beal v. Doe , 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) ; Maher v. Roe , 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) ; Poelker v. Doe , 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (per curiam ); H. L. v. Matheson , 450 U. S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981). But there are a number of cases in which women have been co-plaintiffs along with abortion clinics or providers. See Leavitt v. Jane L. , 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam ); Ohio v. Akron Center for Reproductive Health , 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ; Hodgson v. Minnesota , 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) ; Williams v. Zbaraz , 448 U. S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980) ; Harris v. McRae , 448 U. S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ; Bellotti v. Baird , 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) ; Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). More recently, abortion patients have litigated in the lower courts using their names, those of legal guardians, or pseudonyms. Brief for Respondent/Cross-Petitioner 39; see also Brief for State of Arkansas et al. as Amici Curiae 3, and n. 1.